IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EDWIN J. BUNCH,

                   Plaintiff,                           CV-07-6056-ST

      v.                                     FINDINGS AND
                                            RECOMMENDATION

MICHAEL J. ASTRUE, Commissioner of Social
Security,

                   Defendant.

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Edwin J. Bunch ("Bunch"), seeks judicial review of the Social Security

Commissioner's final decision denying his application for Disability Insurance Benefits ("DIB")

and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act

("Act"), 42 USC §§ 401-33, 1381-83f.  This court has jurisdiction under 42 USC §§ 405(g) and

421(d).  For the reasons that follow the Commissioner's decision should be REVERSED and the

case REMANDED under sentence four of 42 USC §§ 405(g) for further proceedings.

1 - FINDINGS AND RECOMMENDATION

## ADMINISTRATIVE HISTORY

Bunch protectively filed applications for DIB and SSI on January 4, 2005.  Tr. 67-71, 557-58.  His applications were denied initially and on reconsideration.  Tr. 565-70.  After a hearing held on May 19, 2006 (Tr. 594-628), the Administrative Law Judge ("ALJ") issued a decision on July 20, 2006, finding Bunch not disabled because he could perform past relevant work as a materials expediter.  Tr. 19-30.  On January 12, 2007, the Appeals Council affirmed this decision.  Tr. 12-18.  On January 16, 2007, Brunch submitted new evidence to the Appeals Council, and on January 22, 2007, he petitioned the Appeals Council to reconsider its January 12, 2007, decision. Tr. 584.  On March 12, 2007, the Appeals Council denied Bunch's request for review (Tr. 8-11), making the ALJ's decision the Commissioner's final decision.  20 CFR §§ 404.981, 416.1481, 422.210.

## FACTUAL BACKGROUND

Born in 1944, Bunch was 59 years old at the alleged onset of his disabilities and 61 years old at the time of the hearing before the ALJ.  Tr. 67, 557, 598.  He has a general equivalency degree.  Tr. 170, 607.  His past relevant work is as a seafood processor, dock manager, maintenance worker, materials expediter and a construction superintendent.  Tr. 166, 201, 616-18.  He alleges the onset of his disability on August 15, 2004, due to the effects of a brain aneurysm in October 2003, including forgetfulness, getting lost easily, confusion, making mistakes at work, lack of enthusiasm, depression, and difficulty controlling his anger.  Tr. 165-66, 607-08, 610-11.  The medical record also reveals a number of other impairments, including mild osteoarthritis in the left knee and left wrist, history of back strain and mild to moderate

degenerative disc disease at the lumbar spine, history of deep venous thrombosis, obesity, carpal

tunnel syndrome and a history of epicondylar tendinitis.  Tr. 268, 410, 434, 475, 484, 509.

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of no less than 12

months[.]"  42 USC § 423(d)(1)(A).  The initial burden of proof rests upon the claimant to

establish his or her disability.  *Roberts v. Shalala*, 66 F3d 179, 182 (9th Cir 1995), *cert denied*,

517 US 1122 (1996) (citations omitted).  The ALJ engages in a five-step sequential inquiry to

determine whether a claimant is disabled within the meaning of the Act.  20 CFR §§ 404.1520,

416.920.  Below is a summary of the five steps, which also are described in *Tackett v. Apfel*,

180 F3d 1094, 1098-99 (9th Cir 1999):

At step one, the Commissioner determines whether the claimant is engaged in substantial

gainful activity.  20 CFR §§ 404.1520(b), 416.920(b).  If so, then the claimant is not disabled.

At step two, the Commissioner determines whether the claimant has "a severe medically

determinable physical or mental impairment."  20 CFR §§ 404.1520(c), 416.920(c).  If not, then

the claimant is not disabled.

At step three, the Commissioner determines whether the severe impairment "meets or

equals" one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 ("Listing of

Impairments").  20 CFR §§ 404.1520(d), 416.920(d).  If so, then the claimant is disabled.

If the analysis proceeds beyond step three, the Commissioner must determine the

claimant's residual functional capacity ("RFC").  The RFC is an assessment of work-related

activities the claimant can perform on a regular and continuing basis, despite the limitations

imposed by his impairments.  20 CFR §§ 404.1545(a), 416.920(e), 416.945; Social Security

Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

Using the RFC, the Commissioner determines at step four whether the claimant can

perform past relevant work.   20 CFR §§ 404.1520(e), 416.920(e).  If so, then the claimant is not

disabled.

Finally, at step five, the Commissioner determines whether the claimant is able to

perform other work in the national economy.  20 CFR §§ 404.1520(f), 404.1566, 416.920(f).  If

not, then the claimant is disabled.

At steps one through four, the burden of proof is on the claimant.  *Tackett*, 180 F3d at

1098.  However, at step five, the burden shifts to the Commissioner to show that the claimant

can perform jobs that exist in significant numbers in the national economy.  *Id.*

## ALJ'S FINDINGS

At steps one and two, the ALJ found that Bunch had the following severe impairments:

> history of craniotomy (October 2003), for clipping of a large cerebral
> artery aneurysm which had ruptured, with mental status changes followed
> by dramatic improvement leaving a mild cognitive functional decline, a
> history of traumatic injuries including left ankle fracture, status post open
> reduction and internal fixation, mild osteoarthritis with left knee joint
> narrowing, history of back strain and mild to moderate degenerative disc
> disease at the lumbar spine, history of deep venous thrombosis treated
> with Coumodin, obesity, depression, carpal tunnel syndrome, status post
> surgical release, a question of osteoarthritis at the left wrist, and a history
> of epicondylar tendinitis . . . .

Tr. 25.

The ALJ concluded that none of these impairments, whether in isolation or in combination, met or medically equaled one of the listed impairments. Tr. 25-26. The ALJ then assessed Bunch's RFC as the ability to lift and carry 20 pounds occasionally and 10 pounds frequently with only occasional bending over to lift objects, to walk one to two blocks at a time, and to use reminder notes. Tr. 26-29.

Based on this RFC, and the testimony of a vocational expert ("VE"), the ALJ concluded that Bunch could perform his past relevant work as a materials expediter as actually performed. Tr. 29. Although the Dictionary of Occupational Titles ("DOT") indicates a materials expediter is a semi-skilled job performed at a medium exertional level, Bunch reported performing the job at the light-exertional level which fell within his RFC. *Id.*

Because Bunch, in spite of his severe impairments, could perform past relevant work, the ALJ found him not disabled within the meaning of the Act. Tr. 30; 20 CFR §§ 404.1520(f), 416.920(f). Finding Bunch not disabled at step four relieved the ALJ of continuing to step five.

## **BUNCH'S CHALLENGES**

Bunch disputes the ALJ's determination that he suffers only "mild cognitive functional decline" and possesses the RFC to return to his past relevant work. He maintains that his mental limitations entirely preclude him from all work, entitling him to an award of benefits. He argues that the ALJ erred by: (1) failing to fully credit the opinion of his treating physician; (2) finding his testimony less than fully creditable; (3) ignoring the lay witness testimony submitted in support of his claim; and (4) posing a faulty hypothetical to the VE. In addition, he argues that the Commissioner erred by failing to properly consider the new medical evidence submitted in support of his petition for review to the Appeals Council.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it applies proper legal standards and the findings are supported by substantial evidence in the record.  42 USC § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004).  "Substantial evidence is more than a mere scintilla but less than a preponderance." *Bayliss v. Barnhart*, 427 F3d 1211, 1214 n1 (9th Cir 2005) (internal quotation marks and citation omitted).  "It is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Orn v. Astrue*, 495 F3d 625, 630 (9th Cir 2007), quoting *Burch v. Barnhart*, 400 F3d 676, 679 (9th Cir 2005).  This court must consider the record as a whole, weighing both the evidence that supports and detracts from the ALJ's conclusion.  *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998).  The reviewing court may not substitute its judgment for that of the Commissioner.  *Id,* citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).  Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading.  *Batson*, 359 F3d at 1193.

## FINDINGS

### I.    Medical Source Statements

A significant portion of the record relates to Bunch's physical limitations.  However, Bunch disputes only the ALJ's findings as to his mental limitations.  Thus, the relevant inquiry is whether the substantial evidence in the record supports those findings.

The dispute over the proper weight to assign the various medical opinions in the record is reflected in the two very different hypotheticals posed to the VE and their impact on the ultimate

issue of disability.  The first hypothetical, submitted by the ALJ, recited the RFC with the non-disputed physical limitations and the cognitive limitation of having to use reminder notes.
Tr. 618-19.  The limited cognitive impairment reflected in this hypothetical is based on the opinions of William A. McConochie, Ph.D., a licensed psychologist to whom DDS[1] referred Bunch for evaluation, and two non-treating, non-examining physicians.  Based on the ALJ's hypothetical the VE concluded that Bunch could return to his past relevant work as a materials expediter.  Tr. 620.

Bunch's attorney posed the second hypothetical to the VE based on the opinion of Barry Jarvis, M.D., Bunch's treating physician.  This hypothetical posited that Bunch was only able to hold a "simple, routine, low stress job that does not require [Bunch] to work in close coordination with supervisors or coworkers."  *Id*.  Based upon this hypothetical, the VE stated that Bunch would not be able to perform the materials expediter job.  Tr. 621.

The initial issue is whether the ALJ properly rejected the opinion of Bunch's treating physician in favor of the opinion of Dr. McConochie.  As explained below, based upon the evidence before the ALJ, the ALJ did not err in that respect.  However, in the face of additional medical evidence submitted to the Appeals Council, the substantial evidence in the record does not support assigning more weight to the opinion of Dr. McConochie.

///

### A.    Medical Opinions

#### 1.    Dr. Jarvis

---

[1]    The Department of Disability Services ("DDS") is a federally-funded state agency that makes eligibility determinations on behalf and under the supervision of the Social Security Administration pursuant to 42 USC § 421(a) and 20 CFR § 404.1503.

Dr. Jarvis began treating Bunch on January 27, 2005.  Tr. 398.  The intake note indicates that Bunch "needs disability papers filled out."  *Id*.  Noting the history of a brain aneurysm, Dr. Jarvis observed that Bunch "does clearly appear to have some cognitive impairment.  He forgets words and loses his train of thought, and cannot find words for things, and forgets easily during the interview."  *Id*.

On April 20, 2005, Dr. Jarvis completed a disability claim form listing Bunch's disability as "Brain Aneurysm" and a date of total disability of August 20, 2004.  Tr. 405-06.  For an estimated date to return to work, he wrote, "never [-] permanent disability."  Tr. 406.

 On May 23, 2005, he wrote on another disability claim form that Bunch "will <u>never</u> return to work."  Tr. 403 (emphasis in original).  Just three days later, Bunch reported that his wife felt he may be depressed but that he mostly felt "irritable all the time."  Tr. 396.  Dr. Jarvis observed a normal affect, ideation and mild cognitive impairment.  *Id*.  He assessed Bunch as having "[p]ossible mild depression related to chronic cognitive disability and history of previous frontal cerebrovascular accident which actually may be most of his problem."  *Id*.

On August 26, 2005, Dr. Jarvis completed yet another disability form, again indicating that Bunch would never work due to a permanent disability.  Tr. 394.  On September 15, 2005, He noted that Bunch "is emotionally labile and is cognitively impaired and really not capable of doing much in the way of gainful employment, so I have filled out the forms accordingly." Tr. 393.  On a form dated October 17, 2005, Dr. Jarvis answered when Bunch would be able to return to work as "Never!"  Tr. 392 (emphasis in original).

On December 28, 2005, Dr. Jarvis wrote a letter responding to questions from Bunch's attorney in which he changed his opinion as to Bunch's ability to return to work.  Tr. 391.  That

letter begins by diagnosing Bunch's condition as "mild cognitive impairment, potentially related to previous aneurysm and surgery plus mild-to-moderate affective disorder." *Id*. However, Dr. Jarvis continued that "[t]here are *no strong objective medical findings* supporting this diagnosis." *Id* (emphasis added). Instead, he confessed that his opinion was based entirely on his observations of Bunch at three appointments. From these meetings, Dr. Jarvis concluded that Bunch "appeared to have some difficulty with forgetting words, losing his train of thought, not being able to find words for things, and forgetting easily during the interview." *Id*. He further explained that he had "not subjected him to any formal neuro-psych testing, as he came to me stating that he had a history of this cognitive impairment and that he was on disability for this and was just needing to have forms redone to re-up him so to speak." *Id*. Despite this lack of objective evidence, Dr. Jarvis surmised that "[c]ertainly his previous aneurysm and surgery could cause residual cognitive problems[,]" and [c]ertainly his mild-to-moderate affective disorder could also cause some degree of impairment in this manner." *Id*.

Dr. Jarvis next addressed the impact of his diagnosis on Bunch's capacity for work as follows:

> In my opinion, Mr. Bunch could probably hold a simple, routine, low-stress job that does not require him to come in contact with the public and does not require him to work in close coordination with supervisors or co-workers. I feel that he could be present full-time, eight hours per day, five days a week, potentially without special accommodations (depending on the job description) and without excessive absences from work.

*Id*.

However, the letter ends with the following qualification:

> Certainly, I think it may be of benefit to have another battery of neuro-psych tests performed from a local independent objective provider . . . to get more specific information about his degree of cognitive impairment.

> As mentioned above, I have relied on his self-reporting primarily and brief observances in the office to support the diagnosis of cognitive impairment."

*Id*.

Dr. Jarvis next saw Bunch on January 31, 2006, regarding ongoing symptoms related to his aneurysm, including sleeplessness, sweating at night, extreme irritability, forgetfulness, argumentativeness, defensiveness, overeating and anxiety. Tr. 494. Based on an examination, Dr. Jarvis concluded that Bunch had normal affect and ideation and did not "have any obvious trouble remembering things or coming up with appropriate words during our meeting." *Id*. He assessed Bunch with "[a]nger management issues, likely underlying stress, anxiety, and depression." Tr. 495.

Bunch met again with Dr. Jarvis on February 20, 2006. Dr. Jarvis discussed his opinion of Bunch's disability in the same tone as his December letter:

> [Bunch] is in to discuss his paperwork. He is re-upping for Social Security Disability. There has been some contesting of that in light of the fact that he has had some other outside Neuropsych type testing and evaluation that suggested that he really was not significantly affected such that he qualified for disability. We have spent time talking about the fact, today, that basically the previous the [*sic*] forms I filled out were based on his say-so, in terms of the amount of cognitive defect he was having, without doing any objective testing, and I have suggested that he probably needs to do some further Neuropsych testing with another outside source to see if he, in fact, would qualify for ongoing disability.

Tr. 492.

///

## 2.    **Dr. McConochie**

The "outside Neuropsych type testing" referred to by Dr. Jarvis occurred on April 11, 2005, with Dr. McConochie. Tr. 356. Dr. McConochie evaluated Bunch on referral by DDS "to

10 - FINDINGS AND RECOMMENDATION

help determine [Bunch's] eligibility for benefits with a special request to clarify possible evidence of brain aneurysm." *Id*. McConochie's interview and evaluation lasted three hours and involved four tests.

The Wechsler Adult Intelligence Scale - III indicated to Dr. McConochie that Bunch "is functioning in the average range in both verbal and spatial intellectual aptitude." Tr. 359. However, his performance did "suggest[] some possible cognitive slowing secondary to his aneurysm" and "a somewhat antisocial personality disposition, as characterized by numerous problems with the law as a young adult." *Id*.

The Wechsler Memory Scale - III test indicated that Bunch "is functioning in the high average range in memory functioning overall . . . . Thus, his aneurysm does not appear to have affected memory functioning at all." Tr. 360. Instead, Dr. McConochie posited that "[Bunch's] daily memory difficulties may be a side effect of concentration problems secondary to anger and/or depression." *Id*.

Two additional tests, Trail Making and Aphasia Screening, showed consistent results. Bunch's performance on the Trail Making test indicated "possible cognitive slowing secondary to his aneurysm but not of a severe degree." *Id*. His performance on the Aphasia Screening test did "not suggest brain damage affecting significant aspects of cognitive functioning." *Id*.

Based on his interview, a review of his medical records, and the testing results, Dr. McConochie gave the following diagnosis:

> Axis I, Clinical
> 309.0 Adjustment disorder with depression and anger, mild.
>
> Axis II, Developmental/Personality Disorder.  None.

Axis III, Physical Disorder.  Claimant reports knee and hip pain.  Status
post aneurysm.  Headaches

Axis IV, Psycho-social Stressor Severity.  3, moderate.  Edwin's
depression appears to be secondary to brain surgery debt and
unemployment.

Axis V, Global Adaptive Functioning.  Edwin is able to handle activities
of daily living without undue difficulty.

*Id*.

As a result, he concluded that Bunch "is a 60-year-old man [who] does not appear to have

any major psychological limitations to work activity."  *Id*.

### 3.    DDS Reviewing Physicians

Dorothy Anderson, Ph.D., completed a Psychiatric Review Technique ("PRT") form on

April 18, 2005.  Tr. 362.  Her opinion coincides with the initial denial of Bunch's benefits on

April 20, 2005.  Tr. 560.  A review of the record, including Dr. McConochie's opinion, led

Dr. Anderson to conclude that Bunch did not suffer from a severe impairment.  Tr. 362.  She

found that he did not meet the diagnostic "A" criteria for Listing 12.02 Organic Mental

Disorders, but did have a "mild cognitive impairment following a brain aneurysm."  Tr. 363.[2]

She also determined Bunch did not meet the criteria for Listing 12.04 Affective Disorders,

finding that his impairment of "[a]djustment disorder with depression and anger," while present,

did not satisfy the diagnostic criteria for the listing.  Tr. 365.  Finally, she found he had an

unspecified personality disorder that did not meet the criteria of Listing 12.08 Personality

---

[2] Each Listing diagnosis is comprised of clinical findings listed under paragraph A ("paragraph A criteria") and functional limitations under paragraph B ("paragraph B criteria").  To establish a presumptive disability under one of the listings, the claimant must establish that he or she meets both criteria.  20 CFR Pt 404, Subpt. P, App. 1, § 12.00.  Several of the Listings for mental disorders included additional limitations under paragraph C ("paragraph C criteria") which are addressed only if the paragraph B criteria are not satisfied.  *Id*; *see also Ramirez v. Shalala*, 8 F3d 1449, 1452 (9th Cir 1993).

Disorders.  Tr. 369.    Addressing the functional, or "B," criteria of these listings, Dr. Anderson

concluded that Bunch had only a mild degree of limitation in one out of the four functional

criteria: difficulties in maintaining concentration, persistence or pace.  Tr. 373.  She also found

no evidence of the presence of "C" criteria.  *Id*.  In her notes, Dr. Anderson states that she

believed that Bunch's performance at Dr. McConochie's exam belied his assertions that he has

difficulty following instructions and understanding.  Tr. 374.  Because she felt it was consistent

with the objective evidence in the record, she gave "heavy weight" to Dr. McConochie's

evaluation in reaching her own conclusions.  *Id*.

Coinciding with Bunch's unsuccessful request for reconsideration was a review by Peter

Lebray, Ph.D.  Tr. 376.  His findings track those of Dr. Anderson, except that he found mild

limitations present in three of the four functional criteria for listings 12.02 and 12.04.  Tr. 386.

Nevertheless, relying on Dr. McConochie's evaluation, he found no evidence of a severe

impairment.  Tr. 388.

### B.    <u>ALJ's Decision and Bunch's Objections</u>

The ALJ found that Bunch's limitations "were not as limiting as suggested by Dr. Jarvis"

on December 28, 2005, because Dr. Jarvis "is a general practice specialist and did not perform

any psychological testing to formulate his opinion," but instead based his opinion on Bunch's

subjective complaints and appearance during three office visits.  Tr. 29.  In contrast, the ALJ

assigned "significant weight" to Dr. McConochie's opinion as he was "a licensed psychologist"

who conducted "extensive testing" in reaching his conclusion that Bunch had no major

psychological limitations to work activity.  *Id*.  The ALJ also assigned "substantial weight" to

the opinions of the two non-examining, non-treating sources because they were "not inconsistent with the medical record as a whole." *Id.*

Bunch argues that the ALJ erred by rejecting Dr. Jarvis' opinion. First, he claims that the ALJ cannot discredit Dr. Jarvis on the basis that his is not a specialist in psychiatry or psychology. Second, he claims that the ALJ's wrongly concluded that Dr. Jarvis' opinion was based primarily on his subjective complaints. Third, he argues that Dr. Jarvis' opinion was later confirmed by the opinion of an examining physician which the Appeals Council erroneously rejected.

### C.   <u>Legal Standards</u>

"The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant." *Reddick*, 157 F3d at 725, citing *Lester v. Chater*, 81 F3d 821, 830 (9th Cir 1995). This is "[b]ecause treating physicians are employed to cure and thus have a greater opportunity to know and observe the patient as an individual . . . ." *Smolen v. Chater*, 80 F3d 1273, 1285 (9th Cir 1996) (citations omitted). Where the opinion of a treating physician is uncontradicted and consistent with the evidence in the record, it is controlling and may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record. *Lester*, 81 F3d at 830, quoting *Baxter v. Sullivan*, 923 F2d 1391, 1396 (9th Cir 1991). If it is contradicted, the ALJ must still give it weight unless he provides specific and legitimate reasons for rejecting the opinion. *Id*; 20 CFR §§ 404.1527(d)(2), 416.927(d)(2). To do this, the ALJ must "set[] out a detailed and thorough summary of the facts and conflicting clinical evidence, stat[e] his interpretation thereof, and mak[e] findings." *Thomas v. Barnhart*, 278 F3d 947, 957 (9th Cir 2002) (quotations and citation omitted). "Where the opinion of the claimant's

treating physician is contradicted, and the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the nontreating source may itself be substantial evidence; it is then solely the province of the ALJ to resolve the conflict." *Andrews v. Shalala*, 53 F3d 1035, 1041 (9th Cir 1995), citing *Magallanes v. Bowen*, 881 F2d 747, 751 (9th Cir 1989).

Because Dr. Jarvis' opinion is contradicted by Dr. McConochie's opinion, the ALJ was required to give only specific, legitimate reasons for rejecting it.

### D.    Analysis

#### 1.    Specialization

When weighing conflicting medical opinions, the Commissioner's regulations logically permit the ALJ to consider the specialty of each physician. 20 CFR §§ 404.1527(d)(5), 416.927(d)(5). Therefore, an ALJ faced with two inconsistent opinions by physicians who have examined the claimant and made independent clinical findings does not err in considering each physician's speciality in determining the relative merit of those opinions. This is particularly true where, as in this case, one of the physicians is a specialist in that field, and the other physician is not a specialist and, recognizing the limits of his own evaluation, suggests that the claimant obtain a second opinion on the issue from a specialist. Thus, Bunch's assertion that the ALJ may not discredit Dr. Jarvis' opinion on the basis of his lack of specialization is incorrect. Furthermore, this is not a case in which the ALJ erroneously rejected a treating physician's opinion of the claimant's mental limitations solely because the physician was not a Board-certified psychiatrist. *See Sprague v. Bowen*, 812 F2d 1226, 1232 (9th Cir 1987) (finding psychological opinion by treating physician competent psychiatric evidence and reversing lower

court for rejecting it).  Instead, the ALJ was faced with two conflicting assessments concerning

the effect of Bunch's mental limitations on his capacity for work, and correctly assigned them

their due weight.

Moreover, contrary to Bunch's assertion, the ALJ did not entirely reject Dr. Jarvis'

opinion.  Both Drs. McConochie and Jarvis diagnosed Bunch with a degree of cognitive

limitations secondary to his brain aneurysm, but differed as to the extent of the limitations

imposed by the cognitive impairment.  The ALJ determined that the more extensive and pointed

examination on this issue was by Dr. McConochie and accordingly assigned substantial weight

to his opinion that  Bunch "does not appear to have any major psychological limitations to work

activity."

### 2.     Subjective Complaints

A physician's opinion must be supported by medically acceptable clinical and laboratory

diagnostic techniques.  20 CFR §§ 404.1527(d)(2), 416.927(d)(2).  The ALJ may properly reject

or assign little weight to an opinion that "is brief, conclusory and inadequately supported by

clinical findings."  *Thomas,* 278 F3d at 957.  Additionally, the ALJ may assess an opinion's

"supportability" in assigning it weight: "The more a medical source presents relevant evidence to

support an opinion, particularly medical signs and laboratory findings, the more weight we will

give that opinion."  20 CFR §§ 404.1527(d)(3), 416.927(d)(3).  Thus, where one physician's

opinion is based only upon his observations of the claimant and another's opinion is based upon

the results of extensive clinical testing producing consistent results not in conflict with the

record, it is not erroneous for the ALJ to prefer the second opinion.  Furthermore, "[a]

physician's opinion of disability 'premised to a large extent upon the claimant's own accounts of

his symptoms and limitations' may be disregarded where those complaints have been 'properly

discounted.'"  *Morgan v. Comm'r of Social Sec. Admin.*, 169 F3d 595, 602 (9th Cir 1999),

quoting *Fair v. Bowen*, 885 F2d 597, 605 (9th Cir 1989).

In his December 28, 2005 letter, Dr. Jarvis admits that he "relied on [Bunch's] self-

reporting primarily and brief observances in the office to support the diagnoses of cognitive

impairment."  Tr. 391.  Furthermore, he states explicitly that further psychological testing would

be beneficial "to get more specific information about his degree of cognitive impairment."  *Id*.

His notes of the February 20, 2006, appointment with Bunch repeat these assertions.

Bunch argues that the ALJ misread the record by using the weaknesses identified by

Dr. Jarvis' February 20, 2006, notes (which specifically reference the three earlier disability

report forms) to undermine the December 28, 2005, letter.  However, Bunch misreads the ALJ's

opinion.  The portion of the opinion at issue refers to "Exhibit 12F, p.1," which is the

December 28, 2005, letter opinion, followed by "id."  Tr. 29.  It does not refer to Dr. Jarvis'

February 20, 2006, notes. Tr. 492 (Exhibit 20F, p. 6).  Even if Bunch's reading were accurate,

Dr. Jarvis also points out in the December 20, 2005 letter that his opinion was based upon

Bunch's subjective complaints and his observations of Bunch at their three meetings.

Bunch also argues that the ALJ improperly characterized the basis for Dr. Jarvis' opinion

as Bunch's "appearance" instead of as "clinical observations."  However, Dr. Jarvis stated that

"[o]n three occasions I have seen Mr. Bunch in the office, he has *appeared* to have some

difficulty with forgetting words, losing his train of though, not being able to find words for

things, and forgetting easily during the interview."  Tr. 391 (emphasis added).  While this may

indeed be Dr. Jarvis' clinical observations, it is not error for the ALJ to use the doctor's own words.

Finally, Bunch characterizes Dr. Jarvis' opinion as developing over time.  Dr. Jarvis' opinion did develop, but not in Bunch's favor.  The initial disability reports stated that Bunch would "never" return to work due to his "permanent disability."  Yet, a few months later Dr. Jarvis backed away from those earlier opinions by suggesting that Bunch did retain some capacity for working, noting that his previous opinions of complete disability were based on limited evidence.  Dr. Jarvis further retreated from his opinion of complete disability on February 20, 2006, when he again pointed out the limited basis for his earlier conclusions and suggested that Bunch seek further testing.  Dr. Jarvis' changing opinion adds credence to the ALJ's supposition that his earlier opinions of total disability were based primarily on Bunch's subjective complaints which became less certain in light of outside psychological testing.

### 3.    Impact of New Medical Evidence

Bunch finally argues that the Commissioner erred in light of more recent medical evidence.  In late October and early November 2006, Bunch underwent a comprehensive neuropsychological evaluation by Julie Redner, Ph.D.  Tr. 575.  The evaluation involved a lengthy interview on October 24, 2006, 30 minutes of testing two days later, and almost 90 minutes of testing on November 3, 2006.  In addition, Dr. Redner conducted a 15-minute telephone call with Bunch's wife, reviewed the medical records, observed Bunch during her interview, and conducted 14 psychological tests along with select subtests.  In stark contrast to Dr. McConochie, she gave the following diagnosis:

| Axis I: | 294.9 Cognitive Disorder Not Otherwise Specified |
|---|---|
| | 296.33 Major Depressive Disorder, recurrent, severe |
| | 310.1 Personality Change due to Aneurysm Bleed |
| | History of alcohol dependence, in sustained full remission |
| | by self report |
| Axis II: | 799.9 Diagnosis Deferred |
| Axis III: | General Medical Conditions: Please see medical history |
| | section; Cerebral Aneurysm |
| Axis IV: | Psychosocial and Environmental Stressors: Marital |
| | problems, unemployment, financial problems |
| Axis V: | Global Assessment of functioning: Code 50 (current)[3] |

Tr. 582 (footnote inserted).

In general, she concluded that Bunch possessed average or above-average abilities or that his results were at least within normal limits in multiple areas. Tr. 581. He possessed more limited abilities, or "cognitive restriction," including low average speed of information processing, mildly impaired ability to perform tasks requiring new learning and clerical skill, and mildly impaired verbal learning. *Id*. She noted that he:

> did worse on verbal memory testing than in his previous evaluation with Dr. McConochie in [April 2005]. The difference in these two performances may be related to differing task difficulty, greater use of organizational strategy needed for the [California Verbal Learning Test - II ("CVLT-2")], his current depression, and sleep deprivation. There was no evidence of symptom embellishment or malingering on validity testing.

Tr. 582.

Her additional comments focus primarily on the change's in Bunch's behavior since his aneurysm including "decreased initiation, forgetting, difficulty in loud, crowded or distracting

---

[3] The Global Assessment of functioning ("GAF") is a tool for "reporting the clinician's judgment of the individual's overall level of functioning." American Psychiatric Ass'n., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 2000). It is essentially a scale of zero to 100 in which the clinician considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," not including impairments in functioning due to physical or environmental limitations. A GAF score between 41 and 50 indicates "Serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)." *Id*.

settings, poor hygiene, irritability and problems with anger management." *Id.* Dr. Redner notes

that these changes are "suggestive of difficulty with executive functioning" and "are consistent

with his documented history of a right frontal bleed and radiographic evidence of mild diffuse

atrophy, particularly in the area of the medial right frontal lobe." *Id.*

　　　　Dr. Redner recommended that Bunch should consider a medication consultation with a

psychiatrist, increase the structure in his day, and obtain assistance with sleep improvement and

more exercise. *Id.* She also made the following recommendation addressing his ability to work:

> Assistance with vocational issues by an agency such as Vocational
> Rehabilitation Services is suggested. A work evaluation may provide
> additional useful information about this individual's ability to work in a
> competitive environment. Positions requiring rapid thinking, extensive
> public contact, work in noisy or crowded situations, rapid learning and
> recall, or likely conflict should be avoided for the time being.

*Id.*

　　　　Dr. Redner conducted her examination after the ALJ's July 20, 2006, opinion. However,

after the Appeals Council denied review, Bunch submitted her opinion to the Appeals Council

with a request for reconsideration. The Appeals Council set aside its earlier action to review the

new evidence, but again denied the request for review, explaining that "[a]fter considering the

additional information, we found no reason under our rules to review the [ALJ's] decision."

Tr. 8. Although this evidence was submitted after the ALJ issued his decision, the Appeals

Council considered it when denying Bunch's request for review. Therefore, it is part of the

administrative record upon which this court may rely in affirming or reversing the ALJ's

opinion. *See Ramirez*, 8 F3d at 1451-52; *Harman v. Apfel*, 211 F3d 1172, 1180 (9th Cir), *cert*

*denied*, 531 US 1038 (2000).

Bunch argues that Dr. Redner's opinion directly contradicts Dr. McConochie's opinion and provides support for Dr. Jarvis' opinion about Bunch's work limitations. However, the import of Dr. Redner's opinion is difficult to assess. It appears to confirm Dr. Jarvis' opinion which was based upon limited objective evidence, but also suggests that Bunch is capable of performing a job with some (not "extensive") public contact. Yet the VE's testimony appears to exclude his past relevant work even on this basis. Tr. 621. Furthermore, while her diagnosis of severe depression conflicts with Dr. McConochie's diagnosis, it is stronger than Dr. Jarvis' impression of mild-to-moderate depression, although consistent with Bunch's complaint of a gradual cognitive decline. Finally, her opinion as to Bunch's memory capacity is confusing. While she pointed out that he scored lower on some of her verbal memory testing than he did for Dr. McConochie, some of the tests placed Bunch's performance in the normal or average range.

Because of these differences, it is difficult to determine what effect her opinion would have had on the ALJ. Although Bunch does not argue this point, her diagnosis of severe depression could possibly support a finding that Bunch meets the medical and functional criteria for Listing 12.04. Furthermore, the work limitations she identifies are different than those identified by Dr. Jarvis. It is unknown whether a hypothetical posed to the VE containing her limitations would have produced the same opinion as the hypothetical based on Dr. Jarvis' opinion. Finally, to the extent that she identified any severe impairments differently than those identified by Dr. Jarvis or the ALJ, they would have to meet the 12-month durational requirement of 20 CFR §§ 404.1509 and 416.909, which is not clear from the record.

///

///

E.    **Conclusion**

After reviewing all the evidence in the record, this court concludes that in light of the

more severe limitations identified by Dr. Redner, the Commissioner's  decision was not

supported by substantial evidence in the record.  However, this court does not conclude that the

opinion of Dr. Jarvis must be fully credited.  As noted above, while the opinions of Drs. Redner

and Jarvis are consistent in many respects, they also differ in notable respects.  As discussed

below, a remand for additional proceedings is necessary to resolve the ambiguities in the medical

record.

II.    **Bunch's Credibility**

A.    **Bunch's Complaints**

In his initial disability report dated January 26, 2005, Bunch states that his brain

aneurysm has affected him in several ways: "Forgetfullness [*sic*]; Get Lost Very Easy; Confused

by Paperwork; Making Mistakes; No Enthusiasm; Was Treated for Depression But it Didn't Do

Anything."   Tr. 166.  On his function report he described his daily activities only as getting up

and dressing, drinking coffee, watching television, eating, and sleeping.  Tr. 181.  As a result of

his illness he is unable to use his mind.  Tr. 182.  He does his own shopping, cooking, cleaning

and laundry, and driving although he sometimes gets confused on directions.  Tr. 184.  His

hobbies consist of watching television and his social activities are comprised of talking to

members of his family on the phone once a week.  Tr. 185.  His illness has affected his memory,

ability to complete tasks, concentration, understanding, and ability to follow instructions.

Tr. 186.  He reports getting fired due to problems with getting along with other people, does not

handle stress very well and struggles with forgetfulness.  Tr. 187.

On January 5, 2005, several weeks prior to applying for disability, Bunch met with

Dr. John Lebow, his former treating physician, for the first time in a year.  Tr. 257-58.  Since his

last meeting (which occurred not long after his release from the hospital following his brain

surgery), Bunch reported that he had lost his job and gained 30 pounds due to overeating, had no

motivation to do anything, was sleeping erratically, and was angry.  Tr. 257.  He noticed

increasing memory problems, including forgetting why he was at the store and what items he

was supposed to pick up.  *Id*.  Dr. Lebow noted that it was very difficult to separate depression

from possible post surgical status, but he felt that "[o]n the face of this, the vast majority appears

to be depression."  *Id*.

At his April 11, 2005, appointment with Dr. McConochie, Bunch reported he can dress

and groom himself, do routine household chores, grocery shop and cook meals for himself.

Tr. 358.  He typically awakes between 8:00 and 9:00 a.m. and goes to bed between 2:00 and 3:00

a.m.  *Id*.  He does "a few chores for his aunt, on whose property he lives," and "can be on his feet

and busy for up to 60 minutes before leg pain limits him."  *Id*.

At his hearing before the ALJ, Bunch testified that he has problems with his memory and

was let go from his last job as a construction superintendent for forgetting to check up on

subcontractors, fill out paperwork appropriately and order supplies.  Tr. 600-02.  He also

testified to having difficulty reading post-aneurysm.  Tr. 608.  He has pain in his wrists due to

carpel tunnel surgery for which he takes Vicodin.  Tr. 605-06.  Due to pain in his knees, back

and hips, he has difficulty bending over and walking more than one or two blocks at a time,

which causes his knees to swell up and forces him to sit down to recover.  Tr. 608-09.  He has

had increased anger problems since his aneurysm, flies off the handle at people and has conflict

with coworkers.  Tr. 610-11, 615.  He is tired all the time and sleeps two or three times during

the day for intervals of 15 minutes to two hours. Tr. 613.

In November 2006, Bunch reported to Dr. Redner that he feels increasingly depressed

over the course of the day.  Tr. 578.  He has feelings of worthlessness and guilt because he is

unable to provide for his wife and lost "the best job he ever had." *Id.*  He is distractable, loses

his train of thought, and forgets what he is saying. *Id*.  He used to be good at pool, but now

misses a lot of shots and is not capable of playing as before.  Tr. 579.  On a typical day he will

get up between 4:00 and 5:00 a.m., cook breakfast, lie back down and then get up again at 8:00

or 9:00 a.m. *Id*.  He spends his days watching television and doing nothing, driving around and

scratching lottery tickets. *Id*.  He watches television until 2:00-3:00 a.m., dozes off, and is up

and down all night. *Id.*

   **B.    ALJ's Findings**

The ALJ found that the Bunch's "medically determinable impairments could reasonably

be expected to produce the alleged symptoms, but that [his] statements concerning the intensity,

duration and limiting effects of these symptoms are not entirely credible." Tr. 27.  The ALJ gave

several reasons for this finding.

First, he found that the objective medical evidence did not support the extent of Bunch's

symptoms.  The ALJ pointed to notes in the record describing Bunch's successful recovery from

brain surgery.  On November 25, 2003, Bunch reportedly "had a dramatic recovery" and was

"dramatically better."  Tr. 234.  On December 29, 2003, Bunch had recovered reasonably well

and was functioning at a near-normal level, although he reported that he sometimes forgets and

does not quite get all the details of things as well as he would like.  Tr. 240.  The ALJ also

pointed to Bunch's January 2005 visit to a medical center where he was admitted complaining of

right forehead pain, recent increase in his forgetfulness and confusion and difficulty with his

sense of direction.  Tr. 27,  346.  Based on an examination and CT scan of his head, Dr. Melissa

Dougherty concluded that he was suffering from "Mild cognitive functional decline, likely post-

traumatic brain syndrome."  Tr. 348.  She also suspected that "his mental status changes are

multifactorial and perhaps in part related to depression, for which he is being treated."  Tr. 347.

The ALJ also noted that Bunch "was able to drive himself and arrive on time to" his

evaluation with Dr. McConochie, that the results of his testing showed an "average range of

verbal and spatial intellectual levels," and that he "was functioning in the high average range in

memory functioning overall."  Tr. 27  He also pointed to Bunch's ability to do odd jobs for his

aunt and Dr. McConochie's opinion that Bunch had no "major psychological limitations to work

activities."  *Id*.

Finally, the ALJ pointed to Dr. Jarvis' mild treatment history of Bunch consisting of

prescribing antidepressants for mild depression, and the apparent success of the treatment,

referring to a January 31, 2006, note by the Chemawa Health Care Center.  Tr. 28.  While

seeking a refill of his antidepressant medications, the nurse noted that Bunch's mood and affect

were normal with "smiling, cheerful, good eye contact" and that he was "not actively depressed

[at] this time."  *Id*.

Based on his review of the record,  the ALJ concluded:

> While undoubtedly there is a reasonable nexus between some of
> claimant's symptoms and the objective medical evidence revealing back
> strain, history of craniotomy, knee and ankle pain and mild cognitive
> impairments, the undersigned finds the degree of mental and physical
> limitations to be exaggerated. The evidence does not suggest an inability
> to engage in substantial gainful activity since the alleged onset date of

> disability.  The objective evidence falls short of demonstrating the
> existence of pain and limitations that are so severe that the claimant
> cannot perform any work on a regular and continuing basis.  His activities
> of daily living have not been compromised by his impairments.

Tr. 28.

### C.    Legal Standards

Once a claimant shows an underlying impairment which may reasonably be expected to

produce the pain or other symptoms, and absent any evidence of malingering, the ALJ must

provide "clear and convincing" reasons to discredit the claimant's testimony regarding the

severity of symptoms.  *Lingenfelter,* 504 F3d at 1036 (citations omitted).  The ALJ's credibility

findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did

not arbitrarily discredit the claimant's testimony."  *Orteza v. Shalala*, 50 F3d 748, 750 (9th Cir

1995), citing *Bunnell v. Sullivan*, 947 F2d 341, 345-46 (9th Cir 1991) (*en banc*).  The ALJ may

consider objective medical evidence and the claimant's treatment history, as well as the

claimant's daily activities, work record, and observations of physicians and third parties with

personal knowledge of the claimant's functional limitations.  *Smolen*, 80 F3d at 1284.  The ALJ

may also employ ordinary techniques of credibility evaluation, such as weighing inconsistent

statements regarding symptoms.  *Id.*  Once a claimant shows an underlying impairment, the ALJ

may not, however, make a negative credibility finding "solely because" the claimant's symptom

testimony "is not substantiated affirmatively by objective medical evidence."  *Robbins v. Soc.*

*Sec. Admin.*, 466 F3d 880, 883 (9th Cir 2006) (citation omitted).

///

///

### D.    Analysis

1.    **Objective Medical Evidence**

Bunch argues that the ALJ erred in his credibility assessment by primarily relying upon the lack of medical evidence.  He further argues that the ALJ failed to specify what testimony and complaints he found not credible or to explain how the evidence in the record contradicted his testimony.  Instead, the ALJ relied almost entirely upon the opinion of Dr. McConochie which, in Bunch's opinion, was far to general to adequately refute the specific symptoms and limitations he alleges.

The record demonstrates that Bunch has been fairly consistent in reporting his cognitive limitations.  He has repeatedly reported to medical providers difficulty with depression, trouble sleeping, increased anger and outbursts, lack of motivation to do anything other than eat, watch television, and sleep, and forgetfulness and inability to follow instructions.  *See* Tr. 257, 346, 396, 398, 404, 494.  Dr. Jarvis' clinical observations, though brief, confirmed Bunch's complaints, leading him to declare Bunch totally disabled on numerous occasions.  Bunch's testimony concerning forgetfulness is  also confirmed by the fact that he was let go from his most recent job due to his forgetfulness (Tr. 257); by his wife who on several occasions told medical care providers she noticed a gradual increase in forgetfulness since his aneurysm (Tr. 346, 580); and by his daughter who writes that her father's "whole thinking process has diminished" and his "memory [is] greatly affected" (Tr. 177).  Furthermore both his daughter and his wife confirm the increase in irritability, anger and uncontrolled outbursts (Tr. 177, 346, 579-80).  His wife ultimately separated from him because "she couldn't live with him screaming at her daily," which was "a great change from his previous behavior."  Tr. 579.

Morever, Bunch's credibility is greatly bolstered by the examination of Dr. Redner.  She administered symptom embellishment test and concluded that his "performance was without error, suggesting no overt effort to sway test results in the impaired direction."  Tr. 581.  She also noted that his reported changes in behavior since his aneurysm were "consistent with his documented history of a right frontal bleed and radiographic evidence of mild diffuse atrophy, particularly in the area of his medial right frontal lobe."  Tr. 582.  She found it significant that despite the fact that Bunch admitted having anger and aggression problems prior to his aneurysm, they had become so pronounced afterward that his wife of 12 years separated from him and moved out.  *Id*.

Other than a few exceptions in the record in which Bunch appears to be functioning acceptably, the overall weight of the medical record indicates that he suffers from significant limitations and supports the narrative of a gradually diminishing cognitive functioning post-aneurysm.  The only directly contradictory information is provided by Dr. McConochie, but his findings are in stark opposition to the more recent findings of Dr. Redner whose examination was  much more extensive and included an interview of Bunch's wife to obtain third party behavioral observations.

Thus, the objective medical record does not provide convincing evidence that Bunch is exaggerating his complaints.

### 2.    Activities of Daily Living

The ALJ also claimed Bunch's activities of daily living did not support the degree of disability he claimed without specifying which activities.  Bunch admits that he cooks and cleans for himself, grooms himself, does his own grocery shopping every couple of weeks, performs a

few chores for his aunt, and otherwise eats, sleeps and watches television.  While these may have

some bearing on Bunch's physical abilities, his physical limitations are not in dispute.  Absent

from the record is any evidence which would contradict Bunch's claims concerning his mental

limitations, including an inability to concentrate, irritability, depression, and difficulty working

with others.  These limitations are of primary importance since the VE testified that if his

cognitive and social limitations are as great as he reports, Bunch would be precluded from

returning to his job as a materials expediter.  There is no specific evidence that his daily

activities contradict these limitations.  Furthermore, there is no affirmative evidence of

malingering.  Thus, this reason does not clearly and convincingly cast doubt on Bunch's

credibility.

### 3.    Limited Treatment

Although not explicitly set forth as a reason for rejecting Bunch's subjective complaints,

the ALJ alludes to the fact that Bunch received only mild treatment from Dr. Jarvis and, at least

on one occasion, the treatment appeared to be working.  A failure to seek out or follow

prescribed treatment may be used as a basis for finding a claimant's subjective complaints to

lack credibility.  *Orn*, 495 F3d at 638.  Furthermore, the ALJ may consider an claimant's

statements less credible if "the level or frequency of treatment is inconsistent with the level of

complaints."  SSR 96-7p, 1996 WL 374186, *7 (July 2, 1996).

Dr. Jarvis treated Bunch's complaints by prescribing him medications.  Tr. 396, 492, 495.

Bunch met with Dr. Jarvis only five times over the course of approximately 16 months.  While

this does raise questions about the severity of Bunch's symptoms, the mere fact of limited

treatment is insufficient to undermine a claimant's credibility.  The Commissioner's rulings do

not permit such an inference to be drawn "without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p, 1996 WL 374186, *7. The ALJ conducted no such inquiry here. Also Dr. Redner's opinion seriously challenges any conclusion that Bunch's mental and cognitive limitations were adequately treated or improving.

### 4.    Testimony of Tamara Rosebrook

An additional problem with the ALJ's treatment of Bunch's subjective symptoms is his utter failure to address the written report of Tamara Rosebrook, Bunch's stepdaughter. The testimony of third parties who have the opportunity to observe the behavior of the claimant is a valid basis from which to draw conclusions about the true extent of the claimant's asserted limitations. *Smolen*, 80 F3d at 1284. The ALJ has a duty to consider such lay witness testimony. 20 CFR §§ 404.1513(d), 404.1545(a)(3), 416.913(d), 416. 945(a)(3); *Lewis v. Apfel*, 236 F3d 503, 511 (9th Cir 2001). An ALJ may disregard testimony by third party witnesses where it is in conflict with other evidence in the record, but "must give reasons that are germane to each witness." *Dodrill v. Shalala*, 12 F3d 915, 919 (9th Cir 1993).

In her written report, Rosebrook states that Bunch spends his days watching television and eating and lacks his usual ambition. Tr. 176. She states that Bunch "seems to not quite have the ability to understand responsibility [and] grooming. He also no longer has a sense of direction [and] frequently gets lost." Tr. 173. He struggles with insomnia and takes frequent naps, must be reminded to shave and groom himself and needs help and constant reminding to perform household chores. Tr. 174. He seems much more irritable, has less energy, and gets confused. Tr. 176-77. Rosebrook concludes by commenting:

> It saddens me [and] the family to see such a decline in his mental status[.] [H]e was at one time a very brilliant man. It seems to me that he keeps slowly declining. He has great family support. His mother is currently dying of cancer, so he seems more forgetful than usual.

Tr. 179.

This was written before Bunch's wife separated from him and his mother died. Tr. 579.

Rosebrook's testimony directly confirms Bunch's complaints of his limitations since his brain aneurysm. It also agrees with statements made by Bunch's wife to Drs. Redner and Doherty. As it is favorable to Bunch, this court may find that the ALJ's failure to address it is harmless error only if "it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *Stout v. Comm'r of the Soc. Sec. Admin.*, 454 F3d 1050, 1056 (9th Cir 2006). This court cannot.

Rosebrook's testimony supports a finding that Bunch's cognitive limitations are greater than the ALJ included in his RFC assessment. Had the ALJ fully credited Rosebrook's testimony, he could not have concluded that Bunch's only mental limitation was a need to use reminder notes. Rather, he would have had to address Bunch's confusion, anger problems, inability to work with others, and depression. When the VE took into consideration some of these, the VE admitted that he could not return to his past work. Tr. 620-21. Therefore, the error in excluding this testimony was not harmless.

### E.   <u>Conclusion</u>

The ALJ failed to provide clear and convincing reasons for rejecting Bunch's testimony concerning the extent of his limitations as not fully creditable.  The objective medical evidence provides a reasonable basis for his symptoms, his activities of daily living do not contradict it, and the testimony of his wife and step-daughter confirm it.

**III.    Improper Hypothetical**

Bunch contends that the ALJ's decision was based on a faulty hypothetical.  For the reasons discussed above, this court finds that the hypothetical was deficient for failure to include a proper assessment of Bunch's mental RFC.  When the assumptions of a hypothetical posed to the VE are not supported by the record, the opinion of the VE has no evidentiary value.  *Embrey v. Bowen*, 849 F2d 418, 422 (9th Cir 1988) (citations omitted).

However, Bunch also contends that the hypothetical was premised on the false assumption that his past job as a materials expediter was performed no more than 40 hours a week, when Bunch in fact worked 50 hours a week.  In support, Bunch cites SSR 96-8p which provides that:

> Ordinarily, RFC is an assessment of an individual's ability to do sustained work related physical and mental activities in a work setting on a regular and continuing basis.  A "regular and continuing basis" means 8 hours a day, for 5 days a week, *or an equivalent work schedule*.

SSR 96-8p (emphasis added).

In preparing for her testimony, the VE indicated that she had reviewed the work history report submitted by Bunch.  Tr. 618-20.  On this report, Bunch indicated that he had worked 50 hours a week in this position.  Tr. 203.  Therefore, even though the VE did not specifically mention the number of hours he worked, it is reasonable to infer that she considered his equivalent work schedule as part of her analysis.

///

**IV.    Remand**

After finding that the ALJ erred, this court has discretion to remand for further proceedings or for immediate payment of benefits.  *Harman*, 211 F3d at 1180.  The issue turns

32 - FINDINGS AND RECOMMENDATION

on the utility of further proceedings.  A remand for an award of benefits is appropriate when no

useful purpose would be served by further administrative proceedings or when the record has

been fully developed and the evidence is not sufficient to support the Commissioner's decision.

*Rodriguez v. Bowen*, 876 F2d 759, 763 (9th Cir 1989).  Thus, improperly rejected evidence

should be credited as true and an immediate award of benefits directed where "'(1) the ALJ has

failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no

outstanding issues that must be resolved before a determination of disability can be made, and

(3) it is clear from the record that the ALJ would be required to find the claimant disabled were

such evidence credited.'"  *Harman*, 211 F3d at 1178, quoting *Smolen*, 80 F3d at 1292.  Where it

is not clear the ALJ would be required to award benefits were the improperly rejected evidence

credited, the court has discretion whether to credit the evidence.  *Connett v. Barnhart,* 340 F3d

871, 876 (9th Cir 2003).

Both parties agree that Dr. Redner's opinion is appropriately part of the record on which

this court may rely in making its decision.  However, the Commissioner contends that a remand

for immediate award of benefits is not appropriate if it rests on Dr. Redner's opinion.  He relies

on *Harman* which addressed a similar situation where additional material evidence was

submitted to the Appeals Council after the ALJ had issued his opinion:

> While we properly may consider the additional evidence presented to the
> Appeals Council in determining whether the Commissioner's denial of
> benefits is supported by substantial evidence, it is another matter to hold
> on the basis of evidence that the ALJ has had no opportunity to evaluate
> that Appellant is entitled to benefits as a matter of law.  The appropriate
> remedy in this situation is to remand this case to the ALJ; the ALJ may
> then consider, the Commissioner then may seek to rebut and the VE then
> may answer questions with respect to the additional evidence.

*Harman*, 211 F3d at 1180.

33 - FINDINGS AND RECOMMENDATION

In response, Bunch cites the earlier decision in *Ramirez*, 8 F3d at 1455, which considered additional evidence, not available to the ALJ but considered by the Appeals Council, in reaching its decision to reverse and remand for immediate payment of benefits.  Bunch also cites a case from this district which reversed and remanded for immediate payment of benefits based upon new evidence considered only by the Appeals Council.  *Dudley v. Barnhart*, Civil No. 05-6278-AA, Opinion by Judge Ann Aiken (D Or Oct. 4, 2006).

While at first glance these cases appear to be in conflict, they are easily reconciled on their facts.  In both *Ramirez* and *Dudley*, the additional evidence considered by the Appeals Council clearly demonstrated that the claimant met one of the listed impairments. *Ramirez*, 8 F3d at 1454; *Dudley*, pp. 9-10.  Furthermore, in both cases, nothing in the record contradicted the opinions of the physicians.  *Ramirez*, 8 F3d at 1455; *Dudley*, p. 10.  Thus, it was clear from the record that the ALJ would be required to find the claimant disabled and award benefits.

In contrast, in *Harman*, the court determined that even if the additional evidence was fully credited, a finding of disability was not required.  There, as here, the claimant was found not to suffer from any listed impairments.  Therefore, the question was whether he possessed sufficient RFC to perform any other work.  The ALJ found he could perform some work and denied him benefits.  Considering the additional information submitted by the claimant's treating physician that the claimant was totally disabled, the court concluded that the ALJ's RFC determination was not supported by substantial evidence, but two reasons made it inappropriate to remand for payment of benefits.

First, the court noted that the doctor's conclusion was a medical, not a legal conclusion. The court noted that "here there was no testimony from the vocational expert that the limitations

found by Dr. Fox would render Appellant unable to engage in any work." *Harman*, 211 F3d at 1180. The court thus followed the consistent practice of the Ninth Circuit of remanding for further proceedings "where the testimony of the vocational expert has failed to address a claimant's limitations as established by improperly discredited evidence . . . ." *Id*. Second, the court found that it was not appropriate to award benefits as a matter of law on the basis of evidence pertaining to the claimant's RFC that the ALJ had no opportunity to consider.

Both of these reasons apply in this case. Fully crediting Dr. Redner's opinion does not mandate a finding of disability. To begin with, her report does not state that Bunch is entirely incapable of work. Also, the limitations she identified, while similar, are not identical to those identified by Dr. Jarvis. Although the VE concluded that if Bunch's limitations were those suggested by Dr. Jarvis, he would be unable to return to his past relevant work, the limitations posited by Dr. Redner are different and may produce a different result. Finally, it is the ALJ's responsibility to resolve conflicting information in the medical record. The ALJ appropriately considered Dr. McConochie's opinion more persuasive than that Dr. Jarvis' opinion. However, in light of the new and material information provided by the opinion of Dr. Redner (who, like Dr. McConochie, is a specialist), the opinion of Dr. McConochie is significantly undermined. The ALJ should be given the opportunity, in the first instance, to resolve the conflicting medical information.

Finally, even if this court were to conclude that the uncontradicted evidence demonstrated that Bunch is not capable of returning to his past relevant work, it would still be required to remand for further proceedings to consider whether work exists in the national economy which Bunch may perform notwithstanding his limitations. Bunch argues that remand

for this purpose is unnecessary because he is presumptively disabled pursuant to § 202.06 of the

Commissioner's guidelines.  20 CFR § 404. Subpt. P, App. 2, table No. 2, § 202.06.  However,

this guideline requires that the skills Bunch developed throughout his work history be

nontransferable.  Bunch's work history includes skilled and semi-skilled positions, and no

evidence in the record concerns the transferability of these skills.  *See id*, § 201.00(f).  Assuming

that on remand the Commissioner determines that Bunch is incapable of performing his past

relevant work, this issue will require further development.  Therefore, remand for further

proceedings is appropriate.

## RECOMMENDATION

The opinion of the Commissioner should be REVERSED and this case REMANDED

under sentence four of 42 USC  405(g) for further proceedings.

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due July 7, 2008.  If no

objections are filed, then the Findings and Recommendation will be referred to a district judge

and go under advisement on that date.

///

///

///

///

If objections are filed, then a response is due within 10 days after being served with a

copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings

and Recommendation will be referred to a district judge and go under advisement.

36 - FINDINGS AND RECOMMENDATION

DATED this 19th day of June, 2008.

/s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge